FLEMING, Administrator of the Wage and Hour Division, United States Department of Labor, v. FARMERS PEANUT CO.

No. 31.

District Court, M. D. Georgia, Thomasville Division.

March 1, 1941.

Rufus G. Poole, Asst. Sol., U. S. Department of Labor, Wage and Hour Division, of Washington, D. C., and Geo. A. Downing, Regional Atty., Wage and Hour Division, of Atlanta, Ga., for plaintiff.

Jones, Jones & Sparks, C. Baxter Jones, and Chas. M. Cork, all of Macon, Ga., and S. P. Cain and Jeff A. Pope, both of Cairo, Ga., for defendant.

DEAVER, District Judge.

The foregoing case having been submitted to the court upon the plaintiff's application for a permanent injunction, and evidence having been offered and arguments having been made in behalf of both the plaintiff and defendant, upon consideration of the pleadings and evidence, the court makes the following findings of fact:

1. Plaintiff is the Administrator of the Wage and Hour Division of the United States Department of Labor.

2. Defendant is a corporation organized and existing under the laws of the State of Georgia with its principal office, place of business and plant within the corporate limits of Cairo, Grady County, Georgia, a town of 3,169 inhabitants, according to the United States Census of 1930.

3. Defendant is engaged at said place in the business of shelling, sorting, cleaning and grading peanuts, and now has on hand a substantial quantity of peanuts shelled, sorted, cleaned and graded at said place of business, and a substantial additional quantity of peanuts in the shell.

4. All of the peanuts acquired by defendant, including those on hand, both shelled and unshelled, are purchased by defendant as unshelled stock from the farmers who produce them, and, after being shelled, sorted, cleaned and graded by defendant, are sold and distributed by defendant as shelled peanuts.

5. Defendant has been regularly engaged in selling and distributing its shelled peanuts in commerce. As respects its shelled peanuts on hand, it is defendant's purpose and intention to sell and distribute them in commerce, and as respects its unshelled peanuts on hand, it is defendant's intention, after shelling, sorting, cleaning and grading them, to distribute them in commerce.

6. Defendant has employed and is employing at its place of business approximately 100 employees. Three of these are engaged in receiving, sampling, grading and accepting the unshelled peanuts from the farmer who produces them and tenders them to defendant at defendant's place of business in the farmer's truck or wagon. Another employee unloads the peanuts and places them in the warehouse to await shelling. Subsequently, the peanuts are shelled. Four of the defendant's employees are engaged in feeding the peanuts to the shelling machine, and in operating the machine, removing trash to prevent clogging, and in performing kindred duties. The shelled peanuts leave the machine on conveyor belts along which from 60 to 90 women and girls, mostly from nearby farms, are seated. Their duties consist of handpicking the shelled peanuts to remove trash and culls. From the conveyor belts the shelled peanuts fall into a bag which is removed when it is full, sewed up and weighed, and placed in storage or on the platform for shipment. Three persons are employed in these operations.

7. During the period from October 24, 1938, to October 24, 1939, many of the employees engaged in shelling, sorting, cleaning and grading the peanuts were paid wages at rates less than 25 cents per hour, and since October 24, 1939, many of them have been paid wages at rates less than 30 cents per hour.

8. The peanut is an agricultural commodity having the characteristic of the bean or pea and is botanically classified as a member of the bean family.

9. The peduncles of the flower of the plant bend after fertilization and push the pod or husk which contains the seed of the plant into the ground and the peanut ripens underground. The husk or pod is comparable with the bean pod or pea pod.

10. When the peanut has ripened the farmer plows up the plant, shakes off the loose dirt, and stacks the plant on poles in the field. They usually remain in the field several weeks to dry and at the end of that period the pod containing the peanut is removed from the vine in a threshing operation by a peanut picking machine and the peanut in the shell, or outer husk, is loaded on the farmer's truck or wagon and hauled by the farmer to the shelling plant direct from the farm and sold to the sheller at the prevailing market price.

11. Southwest Georgia is extensively planted in peanuts, and the defendant's plant is located in the heart of the Southwest Georgia peanut producing section. The Southeastern peanut producing area, which area produces more peanuts than any other peanut producing area in the United States, includes the Northern part of Florida, the Southwestern part of Georgia, and the Southeastern part of Alabama, and in that section there are located approximately 67 peanut shelling plants. Substantially speaking, these plants are located with reference to and accessible to the peanut crops, and the almost universal practice in this area is for the farmer to haul and sell his peanut crop to the nearest or most accessible shelling plant. In this area only a negligible portion of the crop is purchased by the sheller from intermediaries. In the Virginia-Carolina area a substantial portion of the crop is purchased from the farmer by intermediaries who purchase the peanuts for resale to shellers. In recent years, a substantial portion (approximately 20 per cent. in the 1938–39 season, approximately 7.2 per cent. in the 1939–40 season, and approximately 37.2 per cent. in the 1940–41 season) of the entire crop has been stored in warehouses and purchased by the United States government. Substantially all of these peanuts are sold by the government to mills where they are crushed for the purpose of extracting their oil.

12. There are approximately 120 peanut shelling plants in the United States. Of these there are from 90 to 100 shelling plants situated in the states of Alabama, Florida, Georgia, South Carolina, North Carolina and Virginia.

13. The nearest shelling plants to defendant's establishment are located at Thomasville, Georgia, 15 miles to the east, Moultrie, Georgia, 40 miles to the northeast, Pelham, Georgia, and Camilla, Georgia, 18 and 26 miles, respectively, to the north, and Bainbridge, Georgia, 26 miles to the west. On the south the nearest plants are at Marianna, Florida, and High Springs, Florida, approximately 80 to 90 miles away.

14. The peanuts which are brought to defendant's establishment are all produced on farms in the general vicinity of the establishment, and are all purchased from the farmers who produce them, delivered on the farmer's truck or wagon at the establishment. Approximately 70 per cent of the defendant's peanuts come from farms within a radius of 10 miles. Except for a negligible percentage the balance come from farms within a radius of 25 miles.

15. Except for subgrade peanuts, which are sold unshelled as oil stock, the normal commercial market for peanuts produced in the southeastern area is for shelled peanuts, and shelling, sorting, cleaning and grading the peanut is an essential process in preparing the peanut for market. In that process the outer husk or pod is removed but the soft inner covering remains on the peanut. To prepare the peanut for market involves sorting the shelled peanut into standard commercial grades or classifications.

16. Except for that portion of the crop which is sold to the government and except for subgrade peanuts, all of the peanuts produced in the southeastern area are marketed after they are shelled. In the Virginia-Carolina area, which produces the Virginia type peanut, a portion of the crop is marketed in the shell. Shelled peanuts are customarily sold to peanut butter manufacturers, candy manufacturers and salting and roasting establishments. Shellers in both areas compete for this market. Unshelled peanuts are customarily sold to firms which roast them in the shells and sell them for human consumption. The Spanish type peanut, which is the type of peanut produced in the southeastern area, does not enter this market. The operations which are performed in shelling peanuts are practically standard throughout the industry.

17. The operations involved in shelling, sorting, cleaning and grading peanuts for market are comparable to the operations involved in preparing the kidney bean or lima bean and similar beans for market, which are classified by the Administrator as dry edible beans, except that the initial shelling operation in the case of the kidney or lima bean is done on the farm. The

shelled bean is sold by the producer to conveniently located elevators or warehouses at the prevailing market price, where the beans are hand-picked, the remnants of the pod being removed and the beans being sorted, cleaned and graded into standard commercial grades for market. The dry edible kidney and lima bean and the dry edible peanut are sold by the elevators and shelling plants, respectively, to the edible market for consumption. The machine which separates the dry edible bean pod from the vine also removes the bean from the pod. This machine is mobile and is owned by the farmer or is brought to his farm, where the operation is performed. It is relatively inexpensive compared with the heavier machinery which is employed in removing the peanut from the pod, and which is stationary and located in a building constructed for the purpose.

18. On October 21, 1938, plaintiff duly issued and promulgated regulations prescribing the records of persons employed, and of wages, hours and other conditions and practices of employment, to be made, kept and preserved by every employer subject to any provision of the Fair Labor Standards Act. Defendant has not made, kept or preserved the records prescribed by said regulations.

### Conclusions of Law.

1. The court has jurisdiction of the parties and of the subject matter of the complaint.

2. Pursuant to stipulation of counsel the complaint is interpreted as relating only to those of defendant's employees who are engaged in "shelling,—grading, sorting and stacking peanuts," and as involving only those operations which begin with feeding the unshelled peanut into the shelling machine.

3. Section 13(a) (10) of the Fair Labor Standards Act, 29 U.S.C.A. § 213(a) (10), exempts from both the wage and hour provisions of the act "any individual employed within the area of production (as defined by the Administrator), engaged in handling, packing, storing, ginning, compressing, pasteurizing, drying, preparing in their raw or natural state, or canning of agricultural or horticultural commodities for market, or in making cheese or butter or other dairy products."

4. The peanut is an agricultural commodity, both before and after the process of shelling is performed at defendant's plant, within the meaning of that section of the act.

5. Defendant's employees to whom the complaint relates are engaged in handling, packing, storing and preparing peanuts in their raw or natural state for market within the meaning of that section.

6. Defendant's employees to whom the complaint relates, who are engaged in those operations at defendant's establishment, are employed within the area of production within the meaning of that section.

7. Defendant's employees to whom the complaint relates are exempt under Section 13(a) (10) from both the wage and hour provisions of the Fair Labor Standards Act.

8. Defendant's failure to pay to its employees to whom the complaint relates wages at the rates provided for by Section 6 of the Fair Labor Standards Act, 29 U. S.C.A. § 206, does not constitute a violation by defendant of the act.

9. No authority is delegated to the Administrator to make any definition, or to prescribe any limitation upon the operation of the exemption afforded by Section 13(a) (10) of the act, except to define "area of production".

10. He was not authorized to prescribe conditions, such as the number of persons employed in the establishment, upon which the individuals employed within the "area of production" as defined by him, should be exempt, and insofar as he has attempted by regulation to do so, or has defined "area of production" with reference to such limitations and restrictions, he has attempted to exercise an authority not delegated.

11. The only definition by the Administrator of "area of production" as used in Section 13(a) (10) of the Act is contained in the Administrator's Regulations, Section 536.2(a), (b), (c), (d), as follows:

"Section 536.2—'Area of Production' As Used in Section 13(a) (10) of the Fair Labor Standards Act.

"I. An individual shall be regarded as employed in the 'area of production' within the meaning of Section 13(a) (10), in handling, packing, storing, ginning, compressing, pasteurizing, drying, preparing in their raw or natural state, or canning of agricultural or horticultural commodities for market, or in making cheese or butter or other dairy products:

"(a) if he performs those operations on materials all of which come from farms in the general vicinity of the establishment where he is employed and the number of employees engaged in those operations in that establishment does not exceed seven, or

"(b) with respect to dry edible beans, if he is so engaged in an establishment which is a first concentration point for the processing of such beans into standard commercial grades for marketing in their raw or natural state. As used in this sub-section (b), 'first concentration point' means a place where such beans are first assembled from nearby farms for such processing but shall not include any establishment normally receiving a portion of the beans assembled from other first concentration points, or

"(c) with respect to Puerto Rican leaf tobacco, if he is engaged in handling, packing, storing and drying such tobacco for market in an establishment which is a first concentration point for such tobacco. As used in this sub-section (c), 'first concentration point' means a place where such tobacco is first assembled from nearby farms for such preparation for market but shall not include any establishment normally receiving a portion of the tobacco assembled from other concentration points, nor any establishment operated by a manufacturer for the preparation of tobacco for his own use in manufacturing, or

"(d) if he performs those operations on materials all of which come from farms in the immediate locality of the establishment where he is employed and the establishment is located in the open country or in a rural community. As used in this subsection (d), 'immediate locality' shall not include any distance of more than ten miles and 'open country' or 'rural community' shall not include any city or town of 2500 or greater population according to the 15th United States Census, 1930."

"II.[1] An individual shall be regarded as employed in the 'area of production' within the meaning of Section 13(a)(10), in handling, packing, storing, drying, preparing in their raw or natural state, or canning of perishable or seasonal fresh fruits or vegetables for market; if he performs those operations on materials all of which come from farms in the general vicinity of the establishment where he is employed and the number of employees engaged in those operations in that establishment does not exceed ten."

12. Section 536.2(a) is a definition by the Administrator of the "area of production" of the peanuts shelled at defendant's establishment as including "farms in the general vicinity of the establishment", and the individuals to whom the complaint relates are employed within the "area of production" as so defined, except for the attempt of the Administrator to limit the application of his definition of "area of production" to establishments within that area which employ in the excepted operations not more than seven employees.

13. Such limitation upon the application of the Administrator's definition was not within the power delegated to the Administrator and is invalid and should be disregarded as surplusage. Both the language and the legislative history of the Fair Labor Standards Act indicate, on the contrary, that the application of the act should not depend upon the number of employees employed by a particular employer, but rather upon the character of the services of the particular employee, and, with particular reference to the exemption contained in Section 13(a)(10), upon the location of the place of employment in relation to the area in which are produced the agricultural or horticultural commodities upon which the services of the employee are performed.

14. If the Administrator's Regulation, Section 536.2(a), must stand or fall in its entirety as valid or invalid, as contended by plaintiff, and cannot be applied as a definition by the Administrator of "area of production" except as limited by the reference to the number of employees engaged in the establishment, there is no valid definition by the Administrator of "area of pro-

---

[1] This definition was added July 24, 1940, to become effective October 1, 1940. By Release No. R–1069, dated September 28, 1940, its effective date was postponed until November 1, 1940, for employers canning tomatoes, black-eyed peas, pimientos, snap beans, lima beans, carrots, cabbage, okra and beets, "because unusual weather conditions have delayed the canning season for these commodities." By Release No. R–1026, dated September 12, 1940, its effective date was postponed to December 1, 1940, insofar as it applies to the handling, packing and preparing of apples and pears, "because the original effective date would have occurred during the apple and pear packing season".

duction" applicable to peanuts, and the Administrator has not availed himself of the power delegated to him by Congress to make such a definition.

15. It cannot be said that Congress provided an exemption by Section 13 (a) (10) of the Act and then put it in the power of the Administrator to withhold the exemption by refusing or failing to make a definition of "area of production", or by defining "area of production" and combining with the definition an invalid and unauthorized qualification to the application of the definition. The intention of Congress is clear and unequivocal to exempt from the act those employed in performing services described in Section 13(a)(10) upon agricultural or horticultural commodities where the place of employment is within the area in which the commodities are produced. Neither the language of the act nor anything in the legislative history of its enactment justifies a contention that Congress granted the Administrator the power or authority to withhold this exemption. In the absence of a valid definition by the Administrator the court must determine what constitutes the "area of production" of the agricultural commodity on which the individuals employed by the defendant are engaged within the legislative intent.

16. In the absence of a definition by the Administrator defendant's employees to whom the complaint relates are employed "within the area of production" within the legislative intent.

17. Sub-sections (b) and (c) of the Administrator's Regulations, Section 536.2, relate only to "dry edible beans" and to "Puerto Rican leaf tobacco". While defendant contends that peanuts are "beans" within sub-section (b), and while defendant's establishment is "a first concentration point for the processing" of peanuts "into standard commercial grades for market in their raw or natural state", the Administrator does not appear to have intended to classify peanuts as beans, and the court does not hold that subsection (b) is applicable to peanuts.

18. If sub-section (b) is applicable to peanuts, then defendant's employees to whom the complaint relates are employed "within the area of production" within the definition of that sub-section.

19. Sub-section (d) of the Administrator's Regulations, Section 536.2, purports to afford a definition of "area of production", obviously designed to apply to establishments having more than seven employees, and, therefore, not within subsection (a) as limited by the Administrator, but itself limited to establishments which obtain their materials from farms located within an arbitrary radius of 10 miles, and to establishments physically located outside of the corporate limits of towns of 2,500 or more population. The same invalidity which affects sub-section (a), the limitation in relation to the number of employees, by necessary inference, similarly affects sub-section (d), which has the effect of arbitrarily making applicable to establishments having more than seven employees a different and more restricted area of production than that applicable to establishments having seven or less employees. No legal basis can be suggested for defining "area of production" by arbitrarily prescribing a circular area having a radius of 10 miles, as applied to peanut crops in the Southeastern peanut producing area, or as applied without discrimination to any and all crops, nor can any legal basis be suggested for the requirement that the establishment within that area be located without and not within the corporate limits of a town having 2,500 or more population. Neither the language of the act nor its legislative history justifies such a definition. While it might be inferred from certain remarks during the course of congressional debates, that Congress assumed that the exemption in Section 13(a)(10) would not apply to employees in certain large industrial centers, it appears that this assumption, if it can properly be attributed to Congress, was based upon the fact that these centers are not located in the actual area within which agricultural commodities are produced. There is nothing to warrant the inference that Congress granted to the Administrator the power to withhold the exemption from employees in establishments located within the "area of production" but also within the corporate limits of a town having 2,500 or more population.

20. The defendant has not violated Section 11(c) of the Act, 29 U.S.C.A. § 211(c), as respects any individual employed by defendant to whom the complaint relates because there is no such employee as to whom the records dealt with in said section are required to be made, kept and preserved.

21. The plaintiff is not entitled to an injunction.

Wherefore, it is ordered and adjudged that the permanent injunction prayed for be denied.